Shackelford, J.,
delivered the opinion of the Court.
This is an appeal from the Common Law Court of Memphis, to reverse a judgment against the plaintiffs in error, in favor of Jacob J. Peres, for services which he alleges he rendered them, or was ready to render, and which they refused. The plaintiffs in error are an incorporated religious society of the Jewish faith, and elected Peres their teacher, preacher áhd hasson, from the second of December, 1859, to the first of August, 1860, at a salary of $50 per *622 month. Peres, in the judgment of the congregation, having forfeited his right to these offices, by reason of improper conduct, charges were preferred against him, and he was tried; and on the 18th of April, 18(30, was unanimously dismissed, they having paid him up to the first of that month; and this suit was brought for the balance of his salary — he claiming, and the jury having found, that he was entitled to recover for the entire term of his employment.
We take it, from the nature of the contract, that Peres had a right to insist upon being retained as the minister of this church, until the 1st of August, 1860, unless he lost that right by some fault of his own; and that there can be no legal distinction between a contract with a minister and his congregation, and any other civil contract for personal service; McMillan vs. Vanderlip, 12 Johns., 165-7; Rob vs. Moor, 19 Ibidem, 338, 341. We do not think that this comract is to be held invalid, because it may not distinctly appear to have been made with the vestry of the church; and the duties of Peres assigned him by them, as required in a by-law of the congregation; because if this by-law be anything more than directory, it must be taken that, when the congregation, vestry and all, as they did in this case, received and accepted the services of Peres, with a knowledge of his term of employment and salary, all the prerequisites of the by-law had been either waived or complied with, and he duly clothed with the office of preacher, etc. Most of the rules of law applicable to the case, seem to be settled. Where a party en *623 ters into a special contract for personal service, and having performed part of it, without the consent or default of the other party, voluntarily abandons the further performance of it, he cannot maintain an action on the implied assumpsit, for the labor actually performed: Jennings vs. Carp, 13 Johns., 94, 97; Hughes vs. Connor, 1 Sneed, 622, 628. So, on the other hand, if he be discharged from service without sufficient cause, by the party in whose employment he is, he will be entitled to recover his wages, not only for the labor he has actually performed, but ’to the full extent stipulated in the contract;' but the defendant may show, in diminution of damages,' that after the plaintiff had been dismissed,- he had engaged in other business, either of the same or a different character; in which event, his recovery will be reduced by the amount he received, or is entitled to receive, in his second employment. 'And even if the plaintiff did not, after his dismissal, engage in other business,- we do not see why his claim is not subject to the right to recoup what he could reasonably have earned, during the time covered by the remainder of the contract. But the party employing another, may, upon sufficient cause, put an end to the contract and discharge the • party employed, from his service; in which event, the latter may recover, upon a quantum meruit, the • value of the services rendered his employer, anterior to liis discharge; but he cannot recover more than this; Jones vs. Jones, 2 Swan, 605, 610. In Avery vs. the Inhabitants of Tysingahorn, 3 Mass., 160, the power of the parish to dismiss their *624 pastor for cause, is conceded, but the right to do so arbitrarily, or 'without cause, is denied. These principles are strictly in accordance with the, Usages in the Jewish Church. The Rev. Mr. Tuska, in his evidence, says congregations have power, by their laws, and universal usage among Jews, to remove their preachers, teachers or hassons, for any violation, of Jewish law, or any just cause. It appears that Peres was willing, and offered to serve, the plaintiffs in error; the only question, therefore, is, whether his ¿dismissal was arbitrary, or upon sufficient cause.
The proof shows, that, while he had the care of this church, he opened a store in the City of Memphis, in the grocery,. produce and commission business, under the firm name of Jacob J. Peres & Co.; that he applied to the city authorities and obtained a license to conduct said business, giving the requisite bond to secure the city revenue, and paying the tax on the license; that before he opened the store, he took one of the members of his church into the street, near the synagogue, and pointed out the house in which he said he was going to do business, (the same which he afterwards occupied,) and said he thought of quitting his place as hasson, preacher and teacher; that he resided with his family up-stairs, above the store; often spoke of it as his, and that it was his purpose to discontinue preaching; that he frequently, upon Saturday, which is the Jewish Sabbath, and- upon other days, required by Jewish law to be kept sacred as holy days, transacted wordly business, by keeping open the said store, and offering *625 the merchandise therein for sale; in selling portions of it, and being on the streets soliciting purchasers. To escape the force of this evidence, the plaintiff below, introduced and proved by his brother, Henry Peres, also a Jew, that he was not really a member of the firm of Jacob J. Peres & Co., but that the same was composed of the witness, one of his other brothers, and one Ensell, a brother-in-law, both of whom were residents of Pennsylvania; that although conducted in his name, the plaintiff had no interest in the house, except a commission which witness allowed him, on what he sold outside of the store. The reason why witness did business under the name of Jacob J. Peres & Co., was, that he had failed in Milwaukie, and owed debts, and witness, therefore, could not do business under his own name; a por-, tion of the goods shipped to Memphis, with which to commence business, were marked “Jacob J. Peres & Co.,” before they started from Chicago; the goods belonged to witness, and were so marked because he was in debt, and could not hold property in his own name, which plaintiff below knew. The witness had since settled with all his creditors; paying some the full amount of his indebtedness, but most of them only fifty cents on the dollar; but all are satisfied. The same view of the case is given in the testimony of Maris J. Peres, the other brother and partner, and of others who were examined by the plaintiff below. In the trial before the congregation, after the testimony, (much of which, as is proved, was .the same as that before the Common Law Court,) was closed, *626 Feres was offered an opportunity to make his defense; whereupon he said: “That he had a store, and had no store; that he was a partner, and was not a partner; that he broke the Sabbath, and had not broke the Sabbath;” evidently referring to the complexion given to the case, in the rebutting proof.
Upon this testimony, we are compelled to hold, that, in dismissing Peres, the plaintiffs in error did not act without sufficient cause. Take either view of the case— either that presented in the proof-in-chief, or the one qualified by the rebutting evidence of Henry Peres, and others, (and there can' be but the two) — the defendant in error was guilty of conduct offensive to his Church, and unbecoming a Jewish minister. What difference could it make, if he had no interest in the store, if he yet aided and countenanced those who had, (and to whom he had loaned the use of his name,) in a desecration of the Sabbath, and other holy days of the Jews; and the more especially so, if he took a commission for so doing? But if it be true, as, we have no doubt, it is, that he had no real interest, beyond his commission, and that his connection with the business was only a covinous device, by which the creditors of Henry Peres were defrauded, how much more aggravated was his offense? Could it be expected that a Church, possessing any claim to purity, would retain such a preacher?
The Bev. Mr. Tuska, in his evidence, states, very plainly, the qualifications required of a Jewish minister. “It-is,” says he, “the office of preacher, to expound and preach the Jewish faith, and the observance of the Jewish laws, to his congregation, like ministers of *627 Christian Churches; and it is expected that he will teach obedience to this faith and to these laws, both by precept and example; and he may be dismissed for a failure to do so,”
Extracts, given by Mr. Tush a, from books of the highest authority among the Jewish people, show that the minister must be fit for his office, by being free from the transgression of a positive law, and a loóse reputation, so as to be agreeable to the people; and while the base reputation attaches to him, even an individual member of the congregation may prevent him from officiating; and if witnesses testify that he has violated a positive law, the congregation shall discharge him. So sacred is the Sabbath held among the Jews, that even secular business talk is prohibited on that day. Eor example: It is unlawful to say, “I will do this or that business to-morrow, or will buy such and such articles to-morrow;” and so, also, of business calculations on the Sabbath. He who desecrates the Sabbath is like the worshipper of idols, that is excluded from the fellowship of Israel. The penalty of death is denounced against him, in various passages in the Bible. Mr. Tuska, the learned Jewish minister, examined in the case, states that a desecration of the Sabbath is regarded by the Jewish law as a capital crime, it being a practical denial of the Oreatorship of God. The death penalty, however, has been suspended since the Jews lost their nationality, they having no civil tribunals of their own to enforce such a penalty.
The moral obligation of appropriating one day in seven as a day of rest — a day devoted to the public *628 •worship of G-od, and the observation of Divine ordinances — is admitted by both Jews and Christians.. They differ, however, as to what day is the true Sabbath— the Jew holding it to be on Saturday, ’ and the Christian, on Sunday. But, as a religious institution, it may be kept by setting apart every seventh day, in rotation, after six of labor, whether this be on the last day of the week, as held by the Jews, or on the first, as held by Christians. Considering it, however, not in its moral and religious aspects, but as a mere civil institution, it is not left to every individual which day should be his Sabbath, though he should fulfill the law, so far as to abstract the seventh part of his time from labor. It is held to be necessary and proper, that the Sabbath should be uniformly observed by a whole community at the same time; and hence, in our law, we have fixed upon t'he Christian Sabbath, or first day of the week, as a day upon which the common avocations of life shall be suspended; and though the Jew be bound by this, yet he is not precluded from also observing his own Sabbath, if his conscience shall so constrain him: Encyclopedia of Religious Knowledge — Title, Sabbath.
We think, then, there must be a new trial, upon the facts. The entire evidence is easily reconciled, by taking the view sought to be established by Peres, himself, and which we think the true one. But, in any view, the verdict cannot stand.
We are of opinion, the Common Law Court very properly refused to hear evidence, offered by the defendants below, of what the witnesses had testified on the trial before the Church, without producing the witnesses *629 themselves. Oases might occur where such testimony would, perhaps, be admissible. Eor example: In actions of slander, and such like cases, where the issue depended upon the good faith of the party sought to he made liable — the information on which he acted, whether true or false — might he original and natural evidence.: Farnsworth and Wife vs. Stows, 5 Cushing, 412. But here the question is not whether the plaintiffs in error, in dismissing Peres, acted bona fide, hut whether they had sufficient cause,. as nothing short of this is a defense. It is not claimed that this evidence could have been received to prove the truth of the charges on which the dismissal was had — as, in that view, it ■ was merely hear-say, and not on oath. Neither- could the trial and sentence of dismissal by the congregation, be evidence of the truth of these charges, much less conclusive evidence, any more than the act of a natural person, in discharging one in his service, could be received as proof that he had acted upon just cause.
As a mere question between him and the Church, as to whether he had forfeited his ministerial character, the sentence was, no doubt, conclusive — the congregation being sole judge in the matter, and there being no appellate tribunal; but as to his civil rights upon the contract under which he based his claim, these must be determined by the Courts of the country. We do not say the minutes of the trial and sentence of dismissal are not evidence for some purpose, for -we think they are to show that the party was authoritatively dismissed, and only for that purpose. If the minister, under such a sentence, acquiesce, no further question *630 will arise; but if he do not, and sue for his salary, the charges made by the congregation, as creating a forfeiture, are questions of fact, properly to be submitted to the jury. If they -find the allegations true, the minister will he entitled to no part of his salary which accrued after the vote of dismission. If the allegations are false, justice requires that he shall recover his salary. These allegations, the jury are competent to inquire into; and on such inquiry, ultimately to decide: Avery vs. The Inhabitants of Tyringhow, 3 Mass., 182.
Upon the hypothesis he were dismissed without cause — a supposition, as we have seen, inadmissible, upon the facts — the Common Law Court was asked, by the counsel of the plaintiffs in error, to instruct the jury, that if Peres found other employment equally remunerative, this would bar and exclude any right of recovery against defendants.
We are of opinion, this instruction, in the terms in which it was demanded, was properly refused. Such employment could not be a lar, but only operate as a reduction of damages upon a contract already broken by the wrongful dismissal, and especially so, as to that part of the month of April preceding the dismissal, and upon which nothing had been paid.
The proof, too, as to this defense — and the onus pro-landi was upon the plaintiffs in error: Jones vs. Jones, 2 Swan, 610 — was not as satisfactory as it should have been. The testimony of Henry Peres showed that the plaintiff was book-keeper in the store, from the time of his dismissal, for the balance of the year, and done all the writing, besides having a commission for outside *631 sales; and it is to be inferred that this new employment; (new, at least, as book-keeper,) would not have been taken, but for the dismissal — it not being in keeping with the character of a Jewish minister to engage in secular business, while he has charge of a congregation, though it seems there is no direct prohibition against it. But what he received, or was to receive, or the value of his services for being such book-keeper, is not shown.
It also appears, that, while the same person may, (but not necessarily so,) hold the three offices of preacher, teacher and hasson, their duties are distinct; and that in this case, the compensation for preaching embraced, also, that due as hassor, but not that of teacher, he being paid by the parents of the children, over and above the salary. It is the business of teacher to teach the Jewish faith and Hebrew tongue to the children; and of hasson, to read the prayers in the synagogue. It is not compulsory on the parents to send; and the school, as we understand, is taught, not on the Sabbath, but week days. What influence these facts may be made to have, on a second trial, if this branch of the defense becomes material, (and we do not think it can,) we are not prepared to say.
New trial granted. Weight.
This case was argued, at a former term, before this Court, and the cause taken under advisement. The opinion was written by Judge'Weight. Upon an examination of the record, we are satisfied with the correctness of it, and adopt it' as the opinion of this Court.